November 24, 323 Jimenez v. The City of New York Ms. Aldea Good morning, Your Honors. May it please the Court. My name is Donna Aldea, and I represent Juan Jimenez in this action. Your Honors, the district court in this case erred in granting summary judgment on grounds of qualified immunity based on a defense-friendly construction of the facts and in contravention of clearly established law by finding the existence of arguable probable cause in a situation that honestly is so extreme that if the further inquiry rule did not apply in this case, then it would never apply anywhere. This is a case where the complainant in this matter actually not only said that she would not tell the truth, not only refused to agree to tell the truth during the course of the interview that furnished probable cause. Well, that's not really right. She doesn't say, I'm going to refuse to tell the truth. The interviewer says, do you tell the truth? She says, she acknowledges honestly, which is the way a child might respond. I don't always do that. That's accurate. And the interviewer gets her to, and then she talks about how, the interviewer asks, why wouldn't you tell the truth? She talks about being uncomfortable admitting things to her teachers and so on and so on. She doesn't want to answer. And the interviewer gets her to agree that, all right, if you're uncomfortable and you don't want to tell the truth, just don't answer, right? No. So why couldn't you credit that? Because that's not what happened. So if you look at the record in this case, and I would strongly suggest that the court, if it hasn't done so already, and maybe it has, watch the video in this case. What happened in this case on this video, and it's part of the record on appeal, it's provided to the court. Initially, the interviewer began by asking the complainant if she could promise to tell the truth. And the complainant said, I don't. I don't know. It depends on what it is. It depends on what the question is. Then she asked whether if she decided to answer a question she would promise the answer would be true. And again, the complainant refused to make that commitment and said, I don't know. I don't understand. The record shows that she told substantially the same story to three different people. No, Your Honor, that's not accurate. I'm asking a question. Yes. All right? Don't shake your head. I'm asking a question. She told the guidance counselor at school. She did a one and a half hour interview with this Safe Horizons forensic interviewer who was skilled in doing this. She's being observed by two police officers and somebody else. Then she tells substantially the same story to the ADA, and then they arrest him. Why isn't that arguable probable cause? Because, Your Honor, so the first thing is I'm going to get back to the truth question. But to answer Your Honor's question directly, that's not what happened because her story was not consistent. In fact, the only point on which she was There may have been differences along the way, but she told, she made the accusation substantially the same accusations. Maybe the details changed along the way. But, and the police officers observed, there was an ADA conducting the interview. You don't think that an officer of reasonable competence could disagree as to the existence of probable cause? No, Your Honor. It's so clear that no reasonable officer could have found probable cause. That's your position? Yes, Your Honor. That is my position. And the reason for that is twofold. So first to get back to the initial question, I just want to point out that it's not accurate to say either of the two things. One, that she never said that she would lie because she did. And two, that she never, that she actually agreed ultimately that she would not answer instead of lying because that's also not true. Specifically, after all of this refusal to commit to telling the truth, she was asked specifically, will there be a time, and this is at the video interview at timestamp 1513 is where it begins. Will there be a time where you will tell me a lie or not tell me the truth? And she answers affirmatively, yes. She says, yes, for being honest. And then the interviewer says, thank you for being honest. What about telling the truth feels hard? And then that's when she talks about how sometimes it's uncomfortable to tell the truth. Like she says something when her teachers ask her a question. She says, no. And so it depends on what the question is. And then the interviewer says, okay, it depends on the question. So I accept that. I can't make you say one way or the other. I would only ask that if there's something you don't want to answer, rather than telling me something that's not the truth, just tell me I don't want to say that word. And then she says, uh-huh. And the interviewer says, does that sound fair? And she says, yes. Correct. So I don't know. I mean, I read that as the interviewer addressing this concern that sometimes she doesn't want to tell the truth. And the interviewer resolving that in favor of saying, okay, well, you don't want to tell the truth. Say I'm not going to give you an answer, but don't tell me something that's not true. And she agrees to that. But she- Maybe you're right. The circumstances, somebody shouldn't have believed that or whatever. But the question is whether anybody could have credited that commitment. Well, to the extent that this is a question about how these words should have been interpreted, and to the extent that two interpretations of these words are possible, in other words, whether she made the commitment to- whether she ultimately said that she will lie. And I have to very strongly say, again, when you watch the video, she said, yes, I will lie. If there are two reasonable possibilities, then there should be qualified immunity. Well, Your Honor- If you might be right on how you are interpreting these questions and answers, but if it's a reasonable interpretation to go the other way, then there should be qualified immunity. That's what the law says. Except, Your Honor, that goes to the question of probable cause. But on the question of what the record shows and whether there are competing inferences to be drawn from it, we are here on summary judgment. And so the standard of summary judgment still has to apply. And the question, if there is a competing inference- The standard on summary judgment isn't that we have to draw all reasonable inferences in favor of the plaintiff in this context. The context is, in light of the interview, could a reasonable police officer have found it to be credible- found the girl to be credible? That's the standard. Your Honor, that is correct, except that on summary judgment, to the extent that the record allows for a competing inference on the question or a competing view of what she said, what the import of her words were, that's a question that has to be addressed or has to be addressed by a jury in this case. But I- But just to be precise, it's competing inferences over the question of whether any reasonable officer could have relied on the statement, right? Right. So it's not just competing inferences over the meaning of the statement, period. It is over whether any reasonable officer could have relied on it, right? Right. So- Is that a question of law? Is that a question of law or a question of fact? I'm sorry. Was there any reasonable police officer could have believed her? That's a question of law in this context. Okay. Yes. So the question- but the answer that she gave- so there's no question that she never committed to telling the truth in this case. That's the first thing. And the problem with that, even if- I mean, watching this interview- We just read the transcript. You're saying there's no question that she never agreed to tell the truth. But she actually did agree. You're saying maybe she shouldn't have been believed when she said it, but she did agree that instead of telling a lie, she would decline to answer. But- And therefore, the answers would be truthful. But, Your Honor, I strongly disagree with that because that's not what she said. The question after she explicitly said that she would lie, she answered that yes, and then the interviewer clearly understood that to mean that she was not going to agree to tell the truth. And that's why she asked these follow-up questions and said, okay, I accept that. I can't make you say that you're going to tell me the truth. I can't make you say you won't lie. So if, in fact, after the interviewer says, will you always tell the truth, will you ever lie to me? And she says, yes, I'm being honest. If then the interviewer just pivoted immediately to substantive questions and said, okay, you're going to lie, just give me answers to these questions, maybe that would invalidate a lot of the questions. But, like, that's not what happened. Right. Because then the interviewer inquires, well, why are you going to lie? Under what circumstances would you lie? Okay, I understand some of us are uncomfortable with the questions. When that presents itself, make sure you just decline to answer as opposed to telling the lie and she agrees to that. But, Your Honor, that's not the words that were said. The words were, I would only ask, if there's something you don't want to answer, rather than telling me not the truth, just say I don't want to say that word. The problem is that that circumstance never came up in this interview because the complainant made it clear when you watch this video that she did want to talk about this issue. This was not a subject that she did not want to answer or that she did not want to talk about. This was a subject that she very much wanted to talk about, that she wanted to continue to insert new information about, to volunteer information, to talk about new instances. And to go to Judge Chin's question, to go back to that. But which way does that cut? So if she's explaining that the time that she's going to lie is when she is uncomfortable with the question, and you're saying, well, everybody can see she's not uncomfortable answering the questions, then wouldn't you also just infer, well, okay, she's not lying because she explained she'd only lie when she doesn't want to answer the question. Well, she didn't explain that. It was the interviewer asking, asking, I would only ask if there's something you don't want to answer rather than lie and do this. But the complainant previous to that point had said that she lies all the time, that she's a habitual liar, had said that she was going to lie during this interview and refused to tell the truth. Here's the problem with that. When you've got a situation where the complaining witness is actually saying, I cannot tell you that I'll be honest with you, and beyond that, I can tell you that I lie frequently, and beyond that, I can tell you that I will lie to you here. When you have a situation like you have here, you cannot rely only on the complainant's account to corroborate that. So even if her account is deemed generally consistent, which I'm about to get to because it was not, then that would not be sufficient in this instance. You have to find corroboration of some proof or at least do some investigation to try to find corroboration outside of that. And that's why this case is different than the others. Because here's the problem. If you credit the complainant's own words, she is telling you that she is not going to commit to being honest. And that part of it is what creates the problem with her veracity. So we do have the report to the guidance counselor. Then there's the interview by the forensic specialist. Then there's the confirmation that her neighbor is a detective and she spends time with him and they identify him. Then there's another interview with the ADA where the detectives are observing. And there's a determination that she is credible and that the details are generally consistent. What's the additional corroboration, do you think? Well, so here's the problem. There is no consistency in her statements to go to that. So that is not a form of corroboration. And here's the reason for that. Initially, when she talks to the guidance counselor, we're not talking, by the way, about this happening over a period of weeks or months or years where stories change, memories change, you add more stuff. This is happening on the same day, on the same day, on the 25th of September. She starts by making the report to the guidance counselor in which she says that sometime in the summer, as she's at her neighbor's apartment, after the kids and wife went to bed, he pinned her on the couch and said, I'm going to dry hump you in order to prepare you for when you get older. And then at some point after that, he reached under her shirt, grabbed her breasts with his hands, tried to kiss her, pushed him away, and she said that he had bad breath and left. But then, that same day, when she's talking to the Safe Horizons interviewer, after she explicitly tells the Safe Horizons interviewer that she will tell the full story, and they go through quite a colloquy making sure that she understands that she needs to give all the facts, she never mentions that he threw her to the couch, never mentions during the beginning of that that he threw her to the bed, never mentions that he touched her breasts under her shirt or over it. In fact, what he says to her at the beginning of that interview, and this is starting at 24-22, they begin the interview by her asking, did this happen once or more than once? She says it only happened one time, just the one time, that's it, that's at 24-22. And then says that after she put his kids to bed, he hugged her, this is happening at the door, he hugged her, demanded a kiss, but the complainant said no, joked that his breath stinks, and then he kicked her out, and she adds, for no reason. So, that's not a consistent account, because the key element of that, of being thrown to the bed, of being thrown to the couch, does not exist. Nor is it consistent with the fact that she's then saying that this only happened once, which is what she said to the guidance counselor, and what she said to the Safe Horizons interviewer at the beginning. To the contrary, she then starts embellishing, and she adds of her own volition... But she says it only happens once. Is she talking about the dry-hopping incident, or is she talking about any kind of... Any kind of incident. She doesn't make a statement that, like, there was no inappropriate touching aside from one incident, and therefore, you know, I disavow... You know, it's possible that she was talking about one incident, and then more came out when she became comfortable with an interviewer, right? Well, Your Honor, actually, I mean, she certainly reported only one incident initially to the guidance counselor, and then to the interviewer. The interviewer expressly asked her if she had been inappropriately touched more than once at the beginning, or if anything had happened before, and she said no, it only happened once. So, I think that, again, if you watch the video in context, you will find... I mean, it's a child. You don't think any reasonable officer could determine that she was reporting one incident, but once she became comfortable with an interviewer, she revealed other stuff that had happened? Your Honor, I don't believe that in this context, where the complainant is telling you that she is a person who talks back, who doesn't hold things back, who wants to... And this is all on the video. Who believes that she can't hold things in, she needs to tell people what happened. This is not a scared child who is afraid to speak. She is embellishing on her story, which is at least what one other jurist has found in this case. If you watch the video, you will see that she is volunteering information. Oh, and he always grabs my butt. She's volunteering other incidents. Initially, she says this happens when they're alone. Then she makes incredible claims. This happened in front of my cousins. This happened when he was dry-humping me in front of my cousins. He did it on the bed. He was dry-humping me in front of his children. I think we have that argument. You've reserved time for rebuttal, so we'll hear from you again. Let's turn to the appellee, Ms. O'Brien. May it please the court, Lauren O'Brien on behalf of the officers. There was, in this case, at the very least, arguable probable cause for the defendants to believe that appellant had sexually abused this 12-year-old girl. To overcome qualified immunity, the appellant has to establish that no reasonably competent officer would have made the same judgment call that the officers made here. And in light of the child's three separate statements describing key consistent details of the sexual abuse, that is not possible in this case. And the appellant has utterly failed to identify any precedent that speaks to the specific facts and specific context at issue here. But Ms. Aldea told us that they're not consistent, right? So she reports an incident to the guidance counselor, and then when she provides more details, the incident looks completely different. And she does, you know, come up with all sorts of stories later on that don't seem consistent with saying it only happened once. So why are you saying we should think it's consistent? So probable cause doesn't require that the statement be flawless. So to the extent that there are, you know, minor inconsistencies across accounts, that wouldn't completely undercut probable cause. And here, the most serious allegations of sexual abuse remained consistent across the  And we have testimony from the ADA who both watched the video and then separately interviewed the girl afterwards, saying that he found her account credible across interviews. And largely consistent across interviews. You know, sort of acknowledging this is a child. So what is the most serious incident that you say is consistent with minor inconsistencies? Sure. So the first, the incident that was described in the first conversation with the school guidance counselor, you know, she described that after the children were put to bed and after his wife went to sleep, that was when he attempted to kiss her and touched her, you know, her body in specific ways that she then repeated again in the second interview and then again in the third interview. And she told the same story. She said he waited until the children were in bed. He waited until his wife was asleep. And that she had responded by saying, you know, she didn't know what to do. So she said that his breath stinked, stunk, and then left after that. And that, the outlines and the most, you know, the most serious details remained consistent. And again, you know, it's relevant to the officer's judgment that this was a child. Is it right that it's then behind, on the way out the door in the subsequent account? It's, there was no, in the subsequent account, I don't recall her saying anything about it being in any doorway. It was, she was consistently saying that the children had gone to bed and that the wife had gone to sleep. And in any event, it is, you know, the context is important in a qualified immunity analysis. And this is a context where the officers were well aware this is a 12-year-old girl. This is, you know, she was a child speaking about sexual abuse, a fraught topic. And any sort of, any minor inconsistencies across accounts could, would reasonably have been, you know, considered in that context. And notably, the appellant here in, you know, in her briefs, hasn't identified any case that speaks to that specific context. The two cases that she relies on, McGee and Manginello, neither of them concern allegations of sexual abuse by a child, which this court has specifically said is an unusual context in which decisions between difficult alternatives often need to be made on the basis of limited facts. There often aren't going to be other witnesses. The abuse usually happens in context where no one else is sort of observing it. But the statement itself, you know, suggests opportunities for corroboration because she says he texted her, right, and made a video and so on. Like, they could have asked for that, right? So, so appellant points to sort of, you know, a couple of statements made throughout the course of an over an hour long interview that may have been able to be corroborated. But first of all, you know, the corroboration wouldn't have been going to, again, the more serious conduct. So I think she says, he said, I love you by text to me one time, but I text him with my mom's phone. Or she said, you know, one time when he was just playing, you know, she said he might have been, you know, touching me in a certain way when my cousin was there, but he was just playing. So it wasn't any of the more serious conduct. And the question, this court has been clear, I'll just quote Curley, which says, which is a case from 2001, which says, although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before making an arrest. And nor does it matter that an investigation might have cast doubt upon the basis for the arrest after the fact. And so, you know, even if there were sort of minor points that could have been investigated further, the question is whether any reasonably competent officer might have made the same judgment call at this point where a girl has now said in three different settings to three different people that, you know, someone, a detective in her building is. I don't know how many reasonably competent officers say, okay, we have this account. There's some variations of it. She said she doesn't tell the truth all the time. It's a pretty big deal to go arrest somebody. Maybe we should have corroboration before we do that. You know, the question is... The only evidence is the victim's statement. Why isn't it that any reasonable officer would want, and there's a reason for doubting it, that any reasonable officer would want at least some form of corroboration. So it's not, again, it's not clear from her statements that there was any, you know, any further evidence that either would have been exculpatory or that would have fully confirmed her account. So it's not clear from her statement that any additional inquiry would have been all that helpful. And then also there's just the general context of child sexual abuse investigations, which are notoriously difficult. And it is well known. There's testimony in the record explaining that, you know, the ADA had worked in this area for a long time and knew it's difficult to get corroborating evidence. It's difficult to get other witnesses. And that is sort of in the background here. And I think is relevant to the question of whether any reasonably competent officer would have made the judgment call that was made here. Particularly, again, where the allegations were from a child made against someone who lived in her building who had access to her. And finally, I'll just say that this court... You don't rely on the corroboration, but I guess there is some corroboration, right? They do multiple... They interview with the forensic specialists. They confirm, you know, the neighbor's identity.  And she spends time with him. And then the ADA interviews her, too. Absolutely. Does that corroborate... Is that corroborative? It is both. It is both evidence that they did engage in some further inquiry. And it does show some corroboration of the account. You know, there are other cases in which the question is about one statement and one unreliable statement. And in any case where someone has given multiple statements and they're largely consistent, that is considered, you know, properly considered corroboration. Do you agree with the hearing officer who ultimately said, well, look, it's really a big deal that the account becomes more dramatic over time. And so that makes it less credible? So I... You know, as a general matter, I would say that, you know, anything that occurred after the arrest really, you know, shouldn't be relevant to the court's analysis of whether... I'm not saying that, like, the fact that the hearing officer said that, but, like, that was an accurate characterization of the interview that happened before the arrest. You know, I think it was... So why shouldn't an officer have noticed that? Sure. So I think it was an accurate characterization that she did provide additional details over time. And maybe one reasonable way, one reasonable conclusion to draw from that is that maybe she was, you know, adding embellishing. But the point is that's not the only reasonable conclusion to be drawn. And I think, you know, we described in our brief the point that you made where, you know, this is a child speaking of... speaking about sexual abuse. And, you know, it makes sense that when she was in a context with a forensic interviewer who took time to make her feel comfortable, that at that point she might feel more comfortable providing further details. And I'll just note... So we do... You know, they make the point in their brief that we made some argument that was unpreserved. And I just want to note that we did... You know, we pointed to the totality of the circumstances in our papers below. I'll just point to pages 2 through 4 at docket number 49, which is our memorandum. We emphasized that the totality of the circumstances indicated that a reasonable officer could believe her account. And we pointed to the fact that the officers escalated the matter to the ADA's office for a second interview and examined the consistency between her statements and then the investigation report showing that the officers took other investigatory steps after the forensic interview. So that point was made. And as Your Honor notes, it does also support... It points towards affirmance here. So unless Your Honors have any further questions, we ask the Court to affirm. Thank you very much, Ms. O'Brien. We'll turn back to Ms. Aldea on rebuttal. So just a couple of points. First, going back to what I think is the crux of the argument here. The crux of the argument is not about the corroboration or whether there was sufficient corroboration here or whether there were inconsistencies in the stories. That is significant, but it is not the crux of this case. The reason that probable cause was lacking here is where I started. Because this was a complainant who never said that she would tell the truth. And there is simply no fair reading. When you look at the video and watch the video in this case and you watch what she is actually saying, there is simply no fair reading of this, no reasonable understanding of this in which this complainant is ever stating that she will tell the truth. To the contrary, the Safe Horizons interviewer understands that when she says, when she asks for that promise, that, and when she actually, she says it in reverse. She says, will you lie to me here? When the complainant says yes and smiles and then says, I'm being honest, that is more than just a failure to agree to tell the truth. It is an affirmative acknowledgement that she's going to lie. And it's that very narrow circumstance that makes this case different than other cases that are cited in the respondents' briefs, where they talk about the fact that probable cause doesn't require certainties, that there can be conflicts in accounts, that sometimes child witnesses give conflicting versions. This is not like that. Nor is this like the case like Pisani or other cases that are cited in their brief that deal with warrants that were found where probable cause was found by a neutral magistrate and a presumption, therefore, provides for probable cause. This case is different. So Ms. O'Brien was saying that there were limited opportunities for corroboration. So under the circumstances, it was reasonable. So let's say we do think that the statements about lying trigger some further investigation. You wouldn't suggest that officers should just discount the whole thing and not investigate a possible child sexual abuse, right? No. So what would the officers need to have done to establish probable cause? OK. So the first thing is, there's actually a misstatement of fact. And you can see it on the interview. The fact that the respondents have argued just now here that Mr. Jimenez's wife was asleep when this occurred. Actually, when you watch the video, the complainant actually explicitly stated that though she had put the kids to bed and the wife was in the bedroom, the wife was not asleep. So there could have been a question that was raised as to the wife, particularly when she alleged that she had been violently thrown to the couch, she had been pinned down, and presumably was struggling. So that would have been a very easy form of inquiry that never occurred. There were allegations here. Ask the wife if she had seen her husband assault the 12-year-old girl? Ask if she had heard anything, at least. Ask when she left. Ask what the circumstances were of that. Because the wife was awake, not asleep, according to what the complainant told the Safe Horizons interviewer. The second thing is, there were allegations that these types of dry, humping incidents occurred in front of cousins, in front of his children, in front of other people. There was no attempt that was made to question any of them. Additionally, the initial... She does say in the interview they didn't understand what was going on. The initial outcry in this case was made not to the guidance counselor, but to a friend. A friend whose name she provided, her first name she provided, who she went... I don't know if she went to school with her or what the context was of how she knew her. But that is the friend that told her to go to the guidance counselor. They did not even attempt to speak to the initial outcry witness, the friend that she initially made the complaint to. Never attempted to do that. In spite of the fact that the allegations made to the guidance counselor, the officers knew, because they already had it in the report, were very different than what she was alleging at Safe Horizons. There were videos that apparently documented some of that. No attempt was made to obtain them. Text messages where he allegedly said, I love you. No attempt was made to obtain them. Moreover, the parents, they never even attempted. This girl said she was a habitual liar. She admitted during the course of her interview that she usually lies, that she frequently lies, explicitly. They never even asked her parents whether she lied. And what's interesting is that two days after the arrest, actually the parents did say not only that she had recanted to them, not only that they did not believe her, which the officers would have learned if they had even tried to speak to them, but that she was a habitual liar, which again undermined this whole account. So there were a lot of things that could have been done to try to corroborate here. And this is simply not the kind of case based on the facts that emerged here that would have precluded corroboration. So at the very least, that should have been attempted. What's worse, Your Honors, is if it had been attempted here, then probable cause definitely would have been vitiated. That's why the grand jury that will indict a ham sandwich did not indict here. That's why, ultimately... Well, it depends on the corroboration. So you're saying that if they interviewed the parents before the arrest and the parents said we don't believe her or she's a habitual liar, maybe that would undermine probable cause, although maybe they wouldn't credit what the parents say. Or maybe they would have... If they interview the mother, she says during the interview, I don't reach out to the mother, because wives sometimes take their husband's side or whatever. So maybe the wife would have denied it. It's not obvious the police should have credited that. So it's not totally obvious that it would have been vitiated, right? Well, Your Honor, I think that given what happened here with the rest of this case and the rest of the findings that were made and the rest of the developments, including the recantation that came only two days later, here's what definitely would have happened. This all happened, and this goes to Judge Chin's question earlier. This is not a case where a story evolves over time. This is a case where the allegations were first made on September 25th in the morning, and her Safe Horizons interview occurred on September 25th. The arrest happened on September 27th, and then the recantations came just a day or two after that. If they had at least investigated when they have a witness who is telling them, and yes, a child witness, but a 12-year-old who understands the difference in consequences between truths and lies. When you have a witness who is telling you, I'm going to lie to you, I will not tell the truth with you, and who is then making inconsistent stories and really facially incredible claims as the interview goes on, had they investigated, at least the recantation would have come to light two days later. At least they would have spoken to her parents and learned that she had recanted to them. But they did the arrest. Everything happened on the same day. So not only is that significant because... It was only a couple of days, 25th to 27th. Correct, Your Honor, but I'm saying that the two interviews occurred on the same day, the 25th and the 25th. And there was no investigation that occurred thereafter before the 27th. And, again, if there had been any attempt to do that, they would have, at the very least, uncovered additional evidence, which would have resulted... Thank you very much. Thank you, Ms. Aldea. The case is submitted.